AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

Google LLC Account 52-662-328-7671, IMEI:
357341094512149

)
)
)
)
)
)

Case No.  **24-mj-02793**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952, 960, and 963 | Importation of federally controlled substances and conspiracy related thereto |

The application is based on these facts:

See Affidavit of Special Agent Sarah Cordes, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Maria Tecpanecatl*

*Applicant's signature*

Maria Tecpanecatl, Task Force Officer

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:  _____07/23/2024_____

*Judge's signature*

City and state:  San Diego, California

Hon. Michael S. Berg U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, Maria Tecpanecatl, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.     I make this affidavit in support of an application for a search warrant for information associated with the following Google LLC (Google) account that is stored at premises owned, maintained, controlled, or operated by Google, an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California 94043:

> 52-662-328-7671, IMEI: 357341094512149, used by Jesse Clark GARCIA (the **Target Account**)

as described further in Attachment A for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, importation of federally controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963, as described in Attachment B. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the United States copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information, United States-authorized persons will review that information to locate the items described in Section III of Attachment B.

2.     The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers who have personal knowledge of the events and circumstances described herein; my review of documents and reports related to this investigation; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for the search warrant, it does not set forth each and every fact that I or

others have learned during the course of this investigation. Conversations are set forth below in substance unless noted. Dates, times, and amounts are approximate.

**BACKGROUND AND EXPERIENCE**

3.     I am currently a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). My home agency is the Department of Homeland Security, Customs and Border Protection (CBP) where I have served as a Border Patrol Agent since August 2006. I have been employed as a TFO since November 7, 2022. I am currently assigned to the San Diego Field Office where I handle public corruption and border corruption cases as a member of the Border Corruption Task Force (BCTF). I am charged with investigating allegations of corrupt federal, state, and local public officials that engage in criminal activity for profit, power, as well as those criminal associates who bribe and conspire with any corrupt federal, state, or local public officials. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.     As an investigative or law enforcement officer, I attended a 19-week training academy, which included, among others, training in conducting narcotics investigations, and becoming familiar with the manner in which controlled substances are packaged, marketed, transported, and consumed. I also attended a six-week course at the CBP Advanced Training Center (ATC) on handling Confidential Human Sources. I have handled confidential human sources both for FBI and for CBP and have created actional intelligence and intelligence reporting from this information. Additionally, I attended a Border Corruption Conference sponsored by the FBI and the Office of Responsibility in March 2023.

5.     On the job, I have participated in multiple separate investigations involving the importation of controlled substances. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, pen register and trap and trace devices, telephone toll analysis,

2

undercover operations, tracking warrants, search warrants, and electronic examinations of evidence. Through these investigations, my training, experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I also am familiar with the methods employed by narcotics organizations to thwart detection by law enforcement, including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Through the totality of my training and experience, I have familiarized myself with the jargon, mannerisms, and methods employed by distributors of controlled substances.

6.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for individuals involved in the importation of federally controlled substances to work in concert with other individuals and to do so by utilizing cellular telephones and other portable communication devices to maintain communications with co-conspirators in order to further their illicit criminal activities. Drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing federally controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. The telephone enables drug traffickers to maintain contact with associates, suppliers, and customers, often through messaging services, including but not limited to Google Duo, Google Messages, Google Hangouts, Google Meet, and Google Chat, as well as through the use of third-party communication applications. I also know that drug traffickers often create secondary phone numbers through applications, like Google Voice, for the purpose of making calls and sending messages to individuals that the user seeks to compartmentalize from their primary phone number. Additionally, I know that drug traffickers often document their illicit activities through photographs stored on their telephones. For example, traffickers often maintain photographs of, among others, license plates of load vehicles, pay-and-owe ledgers, and money proceeds from the trafficking of

controlled substances. I also know that traffickers often use location services, such as Maps and Waze (a traffic tracking service), to coordinate locations for meeting with co-conspirators, including to transfer cash representing the ill-gotten gains from the trafficking. I also know that much of the aforementioned data is often backed-up on virtual cloud-based services, such as those offered by Google.

## JURISDICTION

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

**A.     Investigation Background**

8.     On May 3, 2024, a grand jury returned an under-seal Indictment charging eleven counts of drug trafficking activity against Customs and Border Protection Officers (CBPOs) Jesse Clark GARCIA, Diego BONILLO, and a third individual who remains a fugitive. The charges include conspiracy to import controlled substances, in violation of Title 21, United States Code, Sections 952, 960, and 963; multiple counts of importation of controlled substances and aiding in abetting, in violation of Title 21, United States Code, Sections 952 and 960, and Title 18, United States Code, Section 2; *Pinkerton* liability; and criminal forfeiture.

9.     The Indictment was the culmination of a long-term investigation by FBI BCTF, with assistance from the Drug Enforcement Administration (DEA). GARCIA and BONILLO worked with a Mexico-based poly-drug Drug Trafficking Organization (DTO) to ensure that the DTO's drug-laden vehicles were admitted into the United States without inspection at the Tecate, California and Otay Mesa, California Port of Entries (POEs), respectively.

4

10.     As CBPOs, GARCIA and BONILLO were randomly assigned to various locations throughout their respective POEs in one-hour shifts, which were posted daily. The randomness of the shifts, the limited duration of the assignments, and the timing of the scheduling were efforts by CBP to reduce the potential for corruption. Nevertheless, the investigation reflected that GARCIA and BONILLO relayed their duty assignments to DTO members, including the times when they were assigned to the primary vehicle lanes and the specific lanes under their control, so that load vehicles could enter into the United States with their assistance free from inspection.

11.     To date, investigators have identified five drug seizures associated with GARCIA and BONILLO. Three of the seizures associated with GARCIA are discussed below.

12.     GARCIA was arrested on May 2, 2024, and three telephones were seized from him, including one bearing the telephone number associated with the **Target Account**. By this warrant, investigators now seek to obtain information from Google relating to the **Target Account**.[1]

**B.     Background Concerning Google**

13.     Google is a United States company that offers to the public through its Google accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google account.

14.     In addition, Google offers an operating system (OS) for mobile devices, including cellular phones, known as Android. Users of Android devices are prompted to

---

[1]     To date, investigators have been unable to download the contents of the telephone associated with the **Target Account**.

5

connect their device to a Google account when they first turn on the device, and a Google account is required for certain functionalities on these devices.

15. When individuals register with Google for a Google account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment. Signing up for a Google account automatically generates an email address at the domain gmail.com. That email address is the log-in username for access to the Google account.

16. In addition to the above, Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol (IP) addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the Google account.

17. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google account, a user can connect to Google's full suite of services offered to the general public, including those described in further detail below.

18. For example, Google provides email services (called Gmail) to Google accounts through email addresses at gmail.com which can be accessed, including through a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google account by the user. Google preserves emails associated with a Google account indefinitely, unless the user

deletes them.

19.    Additionally, Google provides several messaging services, including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user has not disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

20.    Google also provides an address book for Google accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users also have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves Contacts indefinitely unless the user deletes them. Contacts can be accessed from the same browser window as other Google products, such as Gmail.

21.    Additionally, Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone to Google Photos. Google preserves files stored in Google Photos indefinitely unless the user deletes them.

22.    Google also offers a map service called Google Maps which can be searched for addresses or points of interest. Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates. Users can share their real-time location with others through Google Maps by using the Location Sharing feature. And users can

find and plan an itinerary using Google Trips. A Google account is not required to use Google Maps, but if users log into their Google account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely unless the user deletes it.

23.     Additionally, Google collects and retains data about the location at which Google account services are accessed. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

//
//
//
//

**C.      Probable Cause for the Target Account**

       **i.      Vanessa Valdovinos Smuggles Narcotics at the Tecate POE in April 2021 with the Assistance of the User of the Target Account**

24.      On April 18, 2021, at 11:51 a.m., Vanessa Valdovinos applied for entry from Mexico into the United States at the Tecate POE driving her 2016 Kia Soul. Two vehicle lanes were operational. The one manned by GARCIA, *i.e.*, the user of the **Target Account**, had traffic while the other one did not. Nevertheless, Valdovinos remained lined-up for GARCIA's lane. The CBPO operating the empty lane indicated to the limit-line CBPO to send vehicles to his lane. That CBPO, in turn, indicated for Valdovinos to change lanes; however, she hesitated before finally relenting. Due to a computer-generated alert, she was referred to the secondary inspection area. On the way towards secondary, Valdovinos kept looking back towards the vehicle primary area, specifically looking at GARCIA.

25.      In secondary, packages thought to contain approximately 63.68 kilograms of cocaine and 11.70 kilograms of methamphetamine were found concealed inside the Soul's front passenger door and rear doors, front and rear passenger seatbacks, rear quarter panels, spare tire, rear bumper, and in a backpack located in the rear hatchback. The DEA lab has since tested an approximate 10-kilogram sample of the supposed cocaine and has determined that it contained 8.98 kilograms of fentanyl. A sample of the methamphetamine also was tested. It is 98 percent pure such that of the 1.32 kilograms tested, it contained 1.29 kilograms of methamphetamine (actual). Additionally, approximately 2.8 kilograms of suspected cocaine were later found concealed inside the vehicle. The suspected cocaine is currently being tested. GARCIA has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with this importation.

26.      Crossing records for Valdovinos reflect that she crossed through lanes manned by GARCIA approximately four of the seven times she crossed through the Tecate POE prior to her April 18, 2021, arrest. Given the concerted effort by CBP to randomly assign officers in one-hour shifts, investigators believe this statistic reflects a coordinated effort to cross at times when GARCIA was on duty. Indeed, Valdovinos's remaining three

crossings were through lanes operated by three *separate* CBPOs.[2] Telephone evidence also reflects that Valdovinos had advance knowledge of GARCIA's schedule. For example, on April 9, 2021, at 8:36 a.m., Valdovinos crossed from Mexico into the United States through GARCIA's lane. A video found on Valdovinos's telephone reflects that, beginning at approximately 7:51 a.m., she filmed a video while riding in a vehicle in Mexico as it passed the Tecate POE. Others also were in the vehicle. Towards the end of the video, the following dialogue was heard:

| | | |
|---|---|---|
| Male: | | I'm going to hurry up a little bit, because I'm going to wait here for him to come, the (Unintelligible) the door. (Unintelligible) walking here or (Unintelligible). |
| Female #2: | | (Unintelligible) |
| Valdovinos: | | Ah, I saw! Yes, there are four doors [lanes], but right now only two are open. |
| Male: | | Only two are open. |
| Valdovinos: | | Two are open. |
| Female #2: | | Which one is it that you come in? |
| Valdovinos: | | The first one. |

27.     As reflected in the video, the "first" lane they passed as they drove was later manned by GARCIA. Indeed, records obtained from the POE reflect that GARCIA was scheduled to work that lane from 8:30 a.m. to 9:30 a.m., *i.e.*, beginning 39 minutes *after* the video was taken. As stated above, Valdovinos later crossed through that lane, which was indeed manned by GARCIA, at 8:36 a.m.

//

//

---

[2]     Based on training and experience, investigators believe that these dates were likely dates when Valdovinos was burning plates. Investigators are aware that burning plates – a process whereby an individual and/or vehicle creates a crossing history – is commonplace amongst narcotics traffickers because they believe it reduces suspicion at the POE and/or provides plausible deniability as to their knowledge of the narcotics if they are caught.

### ii. Amanda Mancera Smuggles Narcotics in August 2023 with the Assistance of the User of the Target Account

28. On August 22, 2023, Amanda Mancera applied for entry from Mexico into the United States at the Tecate POE as the driver of her Toyota Camry. GARCIA, *i.e.*, the user of the **Target Account**, admitted her. Records received from the Tecate POE reflect that GARCIA had been assigned to the pedestrian entry lanes at the time he admitted Mancera but had switched with another CBPO to work the vehicle primary lane shortly before she entered.

29. Mancera was later arrested at the Route 94 checkpoint, which is located approximately 15 miles from the Tecate POE. Packages were found concealed in the Camry's trunk under a blanket, all four doors, the rear quarter panels, and underneath the front-passenger carpets. The DEA lab has since confirmed that the packages contained a total of 3.99 kilograms of fentanyl and 216 kilograms of cocaine. Mancera has since pled guilty to two counts of possession with intent to distribute federally controlled substances. As part of her guilty plea, Mancera admitted that the Camry was loaded with the fentanyl and cocaine at the time she crossed the border at the Tecate POE. GARCIA has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with this importation.

30. As with Valdvinos, Mancera's crossing pattern reflects that she coordinated her crossings in order to be admitted by GARCIA. Indeed, crossing records reflect that she crossed through vehicle lanes manned by GARCIA on approximately 12 of the 32 times she crossed through the Tecate POE.[3] Indeed, telephone evidence reflects that Mancera also had advance knowledge of GARCIA's schedule. For example, on May 9, 2023, Mancera crossed through GARCIA's lane (lane two) at the Tecate POE at approximately 10:51 a.m. Prior to crossing, at approximately 10:19 a.m., a co-conspirator sent the following audio WhatsApp message to Mancera: "Remember, from 10:30 to 11:30, door

---

[3] Four of the remaining 20 crossings were admissions by one CBPO, three were admissions by another, four were admissions by two separate CBPOs (two each), and the remaining nine admissions were by nine *separate* CBPOs.

[lane] two." A few minutes later he added, "Just calculate that it's 10:30, come slowly and, because there's no line, no line, Amanda, nothing, it's clean all the way down." Records obtained from the POE reflect that GARCIA was assigned to work lane two of the vehicle primary lanes from 10:30 a.m. to 11:30 a.m., *i.e.*, beginning 11 minutes *after* the message was sent by the co-conspirator to Mancera telling her to cross lane two between 10:30 and 11:30.

### iii.   Nayeli Viridriana Servin Vega Smuggles Narcotics in February 2024 with the Assistance of the User of the Target Account

31.     On February 6, 2024, at 12:54 p.m., Nayeli Viridriana Servin Vega entered the United States from Mexico at the Tecate POE in a Honda Odyssey bearing California license plates. Records from the POE reflect that GARCIA was assigned to work the primary vehicle lanes from 12:00 p.m. to 1:00 p.m. They also reflect that she was admitted by GARCIA despite there being an Automatic Referral for "High Risk Narcotics/Currency Smuggling" on the Odyssey. GARCIA subsequently told POE staff that he had received the alert late, which resulted in him admitting the Odyssey. However, an audit of GARCIA's computer revealed that the Automatic Referral was received approximately 55 seconds *before* he admitted the Odyssey.

32.     After Servin was admitted into the United States, undercover officers surveilled her from a few minutes after her admission until a traffic stop was conducted on her in Chula Vista, California. A K-9 alerted to the Odyssey, and a total of approximately 130 packages of methamphetamine, weighing approximately 58.87 kilograms, were found concealed inside a non-factory compartment located in the Odyssey's floorboard. A sample of the methamphetamine was tested by the DEA lab. It is 99 percent pure such that of the 1.34 kilograms tested, it contained 1.32 kilograms of methamphetamine (actual). Servin was arrested, and a telephone was seized. GARCIA has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with these importations.

33.     Crossing records of Servin reflect that she coordinated her crossings in order to be admitted by GARCIA and BONILLO. For example, before crossing through the

Tecate POE, Servin crossed 32[4] times through the Otay Mesa POE vehicle lanes. Five of those crossings were through BONILLO's lane, which reflects a coordinated effort. Indeed, the remaining 27 crossings were through lanes operated by 25 *separate* CBPOs. Moreover, telephone evidence reflects that she was loaded and in contact with known co-conspirators on dates she crossed through BONILLO's lanes, and not at other times she crossed through the Otay Mesa POE. For example, on December 14, 2023, after Servin entered the United States from Mexico at the Otay Mesa POE through BONILLO's lane, telephone evidence reflects that she had the following WhatsApp exchange with a co-conspirator:

| | |
|---|---|
| Servin: | I'm about to get to San Clemente (audio message)[5] |
| Servin: | I just passed secondary checkpoint |
| Co-Conspirator: | Were they there |
| Servin: | No, closed. Do you have an address yet? |

34.     Investigators are aware that there is a checkpoint located near San Clemente, California. Investigators are further aware that the operational status of checkpoints is often of concern to drug traffickers because vehicles carrying drugs may be identified by law enforcement officers or K-9s working at the checkpoints. As such, investigators believe, based on training and experience, that Servin had imported federally controlled substances on this date. Further bolstering this belief is that less than 20 minutes after Servin was admitted, BONILLO admitted Arquimides Jesus De Los Santos Rabiela who, like Servin, was arrested on February 6, 2024, shortly after crossing through GARCIA's lane at the Tecate POE. His vehicle was found to contain approximately 32.35 kilograms of fentanyl, 37.1 kilograms of methamphetamine, and 54.6 kilograms of cocaine.

//

//

---

[4]     TECs records are searchable via name. Investigators recently discovered a variation of Servin's name under which additional vehicle crossings through the Otay Mesa POE were uncovered.

[5]     The timing of the message vis-à-vis Servin's crossing is consistent with Servin having driven directly from the POE to San Clemente.

## ITEMS TO BE SEIZED

35.     Investigators know that individuals working with criminal organizations often use multiple communication platforms in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Indeed, based on training and experience, investigators are aware that, in addition to telephone and text messaging services (*i.e.*, MMS and SMS), other communication platforms accessible through the telephone, like Duo, Messages, Hangouts, Meet, and Chat, and third-party communication applications, are also often used by drug traffickers to engage in their illegal activity. These communication services can be used to coordinate payments and meetings, conduct negotiations and other matters relating to the criminal scheme, and to send location data, photographs, audio files, and/or videos, concerning the criminal activity, all of which are available from Google as outlined above. Based on my training and experience, voicemails, audio files, photographs, videos, and documents also are often created and used in furtherance of criminal activity. Map searches and location data, which also are available from Google, also may show the presence at known stash locations or other significant locations. Thus, stored communications and files connected to the **Target Account** may provide direct evidence of the offenses under investigation. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

36.     Based on training and experience, investigators are aware that evidence of who was using the **Target Account** and from where, and evidence related to criminal activity of the kind at issue here, may be found in the files and records described in Attachment B and available from Google. For example, account activity, like internet searches, may provide relevant insight into an account owner's state of mind as it relates to the offenses under investigation, such as the owner's motive and intent to commit a crime (*e.g.*, communications indicating a plan to commit a crime) or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

Communications, contacts, photographs, internet searches, location information and other information that Google can produce related to the **Target Account** also can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation, including addresses and/or vehicles used by the subjects of the investigation. And, the identification of apps downloaded from Google Play may reveal services used in furtherance of the crimes under investigation, such as services used to communicate with co-conspirators. Therefore, Google's servers are likely to contain stored electronic communications and information constituting evidence of the crimes under investigation.

37.    Google's servers also are likely to contain "user attribution" evidence. Such evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, device information, the data associated with the foregoing (such as location, date, and time information), photographs, videos, and audio files may be evidence of who used or controlled the **Target Account** at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices – and thereby which user(s) – likely accessed the **Target Account**. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

## **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

38.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Google are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Google for the relevant account and then to analyze the contents of that account on the premises of Google. The impact on Google's business would be severe.

39.    Therefore, I request authority to seize all content from the **Target Account**, as described in Attachment B. In order to accomplish the objective of the search warrant

with a minimum of interference with the business activities of Google, to protect the rights of the subject(s) of the investigation, and to effectively pursue this investigation, authority is sought to allow Google to make a digital copy of the entire contents of the account subject to seizure, as described in Section II of Attachment B. The copy will be provided to me or to any authorized federal investigator. The copy will be forensically imaged, and the images will then be analyzed to identify communications and other data subject to seizure pursuant to Section III of Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

40.    Analyzing the data to be provided by Google may require special technical skills, equipment, and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common applications do not store data as searchable text. The data may be saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

41.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to these warrants may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within **ninety (90) days** of receipt of the data from the service provider, absent further application to this Court.

42.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of the warrants. As reflected above, investigators have identified seizures related to GARCIA between April 2021 and February 2024. As such, investigators seek all materials from Google for the

**Target Account** for the time-period from December 23, 2020 (a month prior to Valdovinos's first crossing in GARCIA's lane, which occurred on January 23, 2021), up to and including May 3, 2024 (the day after GARCIA's arrest).[6]

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

43.     There have been no prior attempts to obtain this evidence other than as stated above. Specifically, on or about May 2, 2024, when GARCIA was arrested, three telephones were seized from him, including one bearing the telephone number associated with the **Target Account**. Investigators obtained warrants for those telephones but, to date, have been unable to download the telephone associated with the **Target Account**. To the extent that changes, investigators may obtain some duplicate data.

## CONCLUSION

44.     Based on the forgoing, I request that the Court issue the proposed warrant.

*Maria Tecpanecatl*
_____
Maria Tecpanecatl, Task Force Officer
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 23rd day of July 2024.

_____
HONORABLE MICHAEL S. BERG
UNITED STATED MAGISTRATE JUDGE

---

[6]     Investigators are aware from training and experience that planning and coordinating a drug-importation offense often takes days or weeks. Investigators also know that criminal associates are often unaware of an arrest and will continue to attempt to contact the arrestee after his/her arrest.

## <u>ATTACHMENT A</u>
## PROPERTY TO BE SEARCHED

This warrant applies to information from a Google LLC (Google) account associated with 52-662-328-7671, IMEI: 357341094512149 (the **Target Account**) that is stored at premises owned, maintained, controlled, or operated by Google, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

## I.      Service of Warrant

The officer executing the warrant shall permit Google LLC (Google), as custodian of the files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.     Information to be Disclosed by Google

To the extent that the information is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any information that has been deleted but is still available to Google or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Google is required to disclose to the United States for each account or identifier listed in Attachment A the following information from December 23, 2020, up to and including May 3, 2024:

A.      All subscriber and user information pertaining to the **Target Account**, in any form kept. Specifically:

1.      All identity information, including full name(s), physical address(es), telephone number(s), email address(es) (including primary, alternate, rescue, and notification email address(es), and verification information for each email address) used to register or maintain the **Target Account**;

2.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol (IP) addresses) associated with those sessions, including log-in IP addresses;

3.      Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers;

4.      Length of service (including start date and creation IP) and types of service utilized;

5. Means and source of payment (including any credit card or bank account number);

6. Change history; and,

7. All device information associated with the **Target Account**, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

B. Records of user activity for each connection made to or from the **Target Account**, including, for all Google services, the date, time, length, and method of connection, data transfer volume, usernames, source and destination IP address, name of accessed Google service, and all activity logs;

C. The contents of all text, audio, and video messages associated with the **Target Account**, including Chat, Duo, Hangouts, Meet, Messages (including SMS, MMS, and RCS), and third-party applications, in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

D. Any records pertaining to the user's contacts, including address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

E. The contents of all media associated with the **Target Account** in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses;

F.    All maps data associated with the **Target Account**, including Google Maps, including all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history; and,

G.    All Location History and Web & App Activity indicating the location at which the **Target Account** was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history.

## III.   Information to be Seized by the United States

All information described above in Section II that constitutes evidence, fruits, and instrumentalities of violations of federal criminal law, namely, importation of controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963, those violations involving the user(s) of the **Target Account**. Specifically:

A.    Electronic records, such as communications, photographs, audio files, videos, and location data, tending to indicate efforts to import federally controlled substances, which may include evidence of unexplained wealth;

B.    Evidence indicating how and when the **Target Account** was accessed or used to determine the user(s)' travel to or presence at locations involved in efforts to import federally controlled substances, such as Ports of Entry, stash houses, load locations, or other meet/delivery points;

C.    Evidence indicating the motive, intent, or consciousness of guilt of the user(s) of the **Target Account** as it relates to the crimes under investigation, *i.e.*, the importation of federally controlled substances;

D.    Evidence indicating the identity of the person(s) who created or used the **Target Account**; and,

E.    Evidence indicating the identity of the person(s) who communicated with the **Target Account** about the importation of federally controlled substances, including records that help reveal those person(s)' whereabouts.